UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CORELINK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:13-CV-1842 (CEJ) |
| | ) |
| PHYGEN, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiff's motion for summary judgment. Defendant has filed a response in opposition to the motion and the issues are fully briefed. In addition, defendant moves to strike certain evidence plaintiff submitted in support of its summary judgment motion. This matter is set for jury trial on January 26, 2015.

Plaintiff CoreLink, LLC, brings this action asserting claims for breach of contract and unjust enrichment to recover $493,780 for medical instruments that were either lost or stolen while consigned to defendant Phygen, LLC. Phygen asserts that it has no liability for the lost instruments and contests the amount CoreLink seeks in damages.

### I. Background

Plaintiff CoreLink, LLC, designs and distributes spinal surgery implants and instruments. On December 31, 2009, CoreLink and defendant Phygen entered into a "non-stocking" distributor agreement, pursuant to which CoreLink agreed to consign surgical instruments and implants to Phygen for use in facilitating sales to Phygen's customers. Agreement [Doc. #1-4]; see also Walter Dep. 64 (Phygen was non-stocking distributor) [Doc. #27-1]. One of CoreLink's products is a set of 80 implants and 66 instruments, called the "PLIF." CoreLink provides distributors with a PLIF and

they in turn supply it to hospitals for use during a surgical procedure. Typically, only one or two implants are used during a single surgery. Walter Decl. at ¶5 [Doc. #27-3]. After the surgery, the instruments and unused implants are returned to the distributor, who restocks the set for use in a future surgery. Id.; see also Smart Aff. at ¶6 [Doc. #28-2]. CoreLink provided a PLIF to Phygen (the PLIF-009) pursuant to the parties' agreement.

On January 19, 2012, Austin Maynard of Expo Acquisitions, LLC ("Expo") contacted Phygen seeking its assistance "with a charity spinal procedure on a pediatric patient [at] Children's Hospital in El Paso, Texas." Smart Aff. at ¶3. Although Phygen had not previously done business with Expo, it agreed to provide the PLIF for this surgery.[1] Phygen sent Expo a distribution agreement on January 20th, but the agreement was never executed and returned. Smart Dep. at 36-37, 109. On January 21, 2012, Phygen had the PLIF delivered to Expo.[2] Fed-Ex confirmation. [Doc. #27-4].

On April 2, 2012, Austin Maynard informed Phygen that all the PLIF implants and instruments were in Expo's possession, with the exception of four implants that had been used in the surgery. Email [Doc.#27-6]. In October 2012, Phygen asked Expo to return the PLIF. See emails 10/9/12 to 10/16/12 [Doc. #27-7]. Austin Maynard

---

[1]Robert Smart, Phygen's Chief Financial Officer, testified that Phygen planned to absorb the cost of any implants used in the surgery because it was a "charity case," in the interest of establishing a connection with a new doctor and hospital. Smart Dep. at 45, 107 [Doc. #27-2].

[2]It was not unusual for the PLIF to be transferred directly from one Phygen distributor or sales representative without first being returned to Phygen. Smart. Dep. at 111. Ethos Medical, a Phygen distributor, had possession of the PLIF set at the time Expo made its request. Ethos shipped the set to Expo at Phygen's direction. Id. at 112.

insisted that he had returned everything to Phygen "months ago," although he could not supply a date or proof of shipping. Email dated 10/12/12 [Doc. #27-7].

In May 2013, Phygen's then-CFO asked CoreLink what the value of the missing set was "in case we cannot get it back from Expo and have to file an insurance . . . claim to be made whole." Email [Doc. #27-9]. On June 20, 2013, Corelink sent Phygen an invoice in the amount of $493,780. Email [Doc. #27-4]. Phygen submitted Corelink's invoice to its insurers, who denied coverage for the loss. Smart Dep. at 49-50, 157-61 [Doc. #27-2].

Additional facts will be included as necessary in the discussion below.

## II. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

### III. Discussion

#### A. Phygen's Motion To Strike

Phygen moves to strike CoreLink's exhibits 4 through 12 submitted in support of its summary judgment motion, arguing that they are not properly "authenticated by and attached to an affidavit made on personal knowledge."

Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." When such an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated. Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012) (citing Rule 56 advisory committee's note). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial -- it is whether it could be presented at trial in an admissible form." Id. (citing Rule 56(c)(2)).

Exhibit 4 was produced by Phygen's insurance broker, Bowermaster & Associates, in response to a records subpoena from CoreLink, and is accompanied by a declaration of Bowermaster's custodian of records. Decl. Shaun Broeker, Pl. Ex. A [Doc. #33-1]. Exhibit 4 is thus properly authenticated. Exhibits 5 through 9 were produced by Phygen, as indicated by the Bates stamps. "Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent." Anand v. BP W. Coast Products LLC, 484 F. Supp. 2d 1086, 1092 (C.D. Cal. 2007); see

-4-

also <u>Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.</u>, 46 F. Supp. 2d 769, 771-72 (N.D. Ill. 1999). Exhibits 10 and 11 are copies of the complaints Phygen filed in the Texas and California state courts, certified copies of which will be admissible at trial. Fed.R.Evid. 902(4) (certified copies of public records are self-authenticating). Finally, CoreLink's corporate representative testified at deposition as to the authenticity of Exhibit 12. Walter Dep. at 91-92. Proper foundation can certainly be established for these documents if they are admitted at trial and Phygen's motion to strike exhibits will be denied.

Phygen also objects to CoreLink's reliance on excerpts from the testimony of Robert Smart, Phygen's Chief Financial Officer, to the extent that he was asked to testify about matters that require legal conclusions. The Court has not relied on this testimony and Phygen's motion is moot in this regard.

### B. Breach of Contract

In a breach of contract action under Missouri law,[3] a plaintiff must establish the following essential elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." <u>Keveney v. Mo. Military Acad.</u>, 304 S.W.3d 98, 104 (Mo. 2010) (*en banc*). Phygen argues that there are disputes of fact regarding its liability and plaintiff's damages.

### 1. Liability

The parties' agreement includes the following relevant provisions:

> 3.1 <u>Consignment of Products</u>. Within two weeks following execution of this Agreement, CoreLink shall deliver to Distributor [Phygen] on consignment the Surgical Instruments and Implants . . . for use in

---

[3]The distributor agreement specifies that it is to be interpreted under the laws of Missouri. Agreement ¶6.2.

connection with facilitating sales to Distributor's customers. . . With respect to any Products delivered by CoreLink to Distributor pursuant to this Section 3.1 . . ., this Agreement shall establish a true consignment in all respects, not a consignment intended as security. <u>Title to and ownership of the Consigned Products shall remain vested in CoreLink until sold by Distributor</u>. Following delivery of the Consigned Products by CoreLink, Distributor shall be solely responsible for the pick-up, receiving, warehousing, picking and delivering of Consigned Products to end-customers.

\* \* \*

3.3 <u>Risk of Loss</u>. <u>Risk of loss shall pass upon delivery to any facility or agent of Distributor</u>. Distributor shall be solely responsible for the care, maintenance and <u>safekeeping of</u>, and all costs of storing, handling, transporting, marketing and selling, the Consigned Products while in Distributor's possession or in the possession of any agent of Distributor. <u>Distributor shall be liable to CoreLink for any loss of or damage to Consigned Products in the possession of Distributor or any of its agents, regardless of cause</u>. Distributor shall secure and maintain the Consigned Products with the same degree of care it uses for its own property, but, in any event, no less than a commercially reasonable degree of care.

(emphasis added).

Phygen argues that there is a genuine dispute of fact as to whether the PLIF was in Phygen's possession before it was shipped to Expo.[4] It is undisputed that CoreLink provided the PLIF set at issue to Phygen, that the PLIF was in the possession of Phygen's distributor, Ethos Medical, and that Phygen told Ethos to ship the PLIF to Expo. See Pl. Ex. 2, Dep. of Robert Smart at 55 (Jason Wakefield was distributor for Phygen under the name Ethos Medical; Phygen asked him to send the PLIF to Expo) [Doc. #27-2]; Pl. Ex. 4 (email directing shipment). Under the plain language of § 3.3, Phygen was solely responsible for the PLIF after receiving it from CoreLink, and it is immaterial to the question of Phygen's liability whether the PLIF was in Phygen's physical possession when it was shipped to Expo.

---

[4]This argument is raised for the first time in Phygen's sur-reply.

-6-

Phygen also argues that CoreLink is not entitled to summary judgment unless it can establish that Expo was its "agent" when the PLIF disappeared. As Phygen points out, there was no distribution agreement formalizing the relationship between itself and Phygen. Phygen suggests that CoreLink thus needs to supply other evidence that Expo was its agent before liability for the lost PLIF is established under § 3.3. This argument fails because, again, Phygen assumed the risk of loss for the PLIF. The fact that Phygen transferred possession of CoreLink's property to Expo without first taking steps to protect itself in the event of loss or theft does not shield Phygen from its liability to CoreLink.

CoreLink has established that it is entitled to summary judgment on liability for the PLIF under the parties' distribution agreement.

### 2. Damages

The parties' contract did not specify the damages to be paid in the event the PLIF was lost or stolen.[5] CoreLink seeks the "retail value" or "list price" for the PLIF, which it state is $493,780.[6] This amount includes costs and lost revenue.

### a. Limitation of Liability

Phygen asserts that the parties' agreement bars recovery for lost profits and revenue, citing the following provision:

> 4.19 Limitation of Liability for Defects. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, LOSS OF PROFITS OR REVENUE, OR INTERRUPTION OF BUSINESS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR OTHERWISE . . . Any

---

[5]Walter testified that CoreLink's new contracts specify that CoreLink has the right to charge the retail price for lost instruments and implants. Walter Dep. at 15.

[6]CoreLink uses the terms "retail" and "list" interchangeably. Walter Dep. at 15.

> original Product, which proves defective . . .will be repaired [or] replaced . . . at no cost . . . **The maximum liability that can be assumed by CoreLink for breach of warranty shall be the invoice price of the Product** . . .

(emphasis in original).

"The terms of the contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (*en banc*). The heading and the text of this provision make it clear that § 4.19 limits liability only for defective products and § 4.19 does not apply to CoreLink's breach of contract claim. See Helterbrand v. Five Star Mobile Home Sales, Inc., 48 S.W.3d 649, 662 (Mo. Ct. App. 2001) (finding limitation of damages provision factually and legally inapplicable). Phygen cites no other legal basis for excluding profits or lost revenues from CoreLink's damages. See Harvey v. Timber Res., Inc., 37 S.W.3d 814, 818 (Mo. Ct. App. 2001) (party not in default may generally recover the profits which would have resulted from performance of contract) (citation omitted).

### b. Section 2.1

Phygen argues that the measure of damages is governed by § 2.1 of the parties' agreement,[7] which provides:

> 2.1 Sale Price to Customers; Purchase Price.
>
> * * *
>
> The purchase price to be paid by Distributor for Products from CoreLink hereunder shall be equal to 50% of the Distributor Net Sale Price to Customer . . . For the purposes of this Agreement, "Distributor Net Sale

---

[7]CoreLink states that it is willing to assent to this measure of damages if the court finds that it is not entitled to recover the retail value of the PLIF. The court has determined only that there is a factual dispute as to CoreLink's calculation of its retail value, not that it is not entitled to retail value. CoreLink has chosen not to address the interpretation of § 2.1 and whether it properly applies in this case.

Price to Customer" shall mean the aggregate net invoice amount for all Products sold by the Distributor to the customer, excluding charges for shipping costs and any sales, use, excise or other taxes. . .

§ 2.1, as amended on June 15, 2015 [Doc. 1-4 at 14-15].

In determining whether this provision provides the appropriate measure of damages for a lost PLIF, the Court must ascertain the parties' intent. Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (*en banc*).

> In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but "subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties."

Id. (citation omitted).

On its face, § 2.1 dictates what Phygen will pay to CoreLink for products it sells to its customers, including replacement implants from the PLIF.[8] The evidence establishes that CoreLink sells PLIFs and implants to its distributors at discounted prices in order to secure future sales. Walter Dep. at 27. For example, in October 2009, CoreLink offered to sell Phygen a complete set of PLIF implants for 40% of the list price. Id. at 52, 54. Walter testified that it would not be "reasonable" for CoreLink to "build profit into the sale" of an entire set, because it derives profit from sales of implants resulting from the purchaser's ongoing use of the set. Id. at 56. CoreLink is "not looking to get much profit on the initial sale of the set. . . [W]e view that we're gaining access to a long term customer and . . . a continued revenue stream." Id. at 57.

---

[8]The evidence shows that, in the ordinary course of the parties' dealings, Phygen did not pay the retail list price for replacement implants. Walter Dep. at 60-61 (Phygen paid CoreLink 50% of what it received from its customers for sales of CoreLink products. Phygen's net sales price to its customers was 40% of list price).

In this instance, the PLIF was lost when it still had several years of projected use. Thus, CoreLink has been deprived of future revenue from the sale of replacement implants. Using § 2.1 to measure damages under this circumstance would place the burden of that loss on CoreLink. Section 3.3, which shifts to Phygen all risk for loss of the product, is evidence that CoreLink did not intend to assume the burden for lost revenue. The court finds that § 2.1 does not supply the measure of damages in the circumstance of a complete loss.

### c.     **Duty to mitigate**

Under Missouri law, "one damaged by breach of contract must make reasonable efforts to minimize resulting damages." Graham Const. Servs. v. Hammer & Steel Inc., 755 F.3d 611, 619 (8th Cir. 2014) (citing Richardson v. Collier Bldg. Corp., 793 S.W.2d 366, 375 (Mo. Ct. App. 1990)). "A party may not recover damages the party could have avoided without undue risk, burden or humiliation." Id. (quoting Harvey v. Timber Res., Inc., 37 S.W.3d 814, 819 (Mo. Ct. App. 2001)) (alteration, quotation, and citation omitted). Phygen bears the burden to show the opportunity to mitigate and the reasonable prospective consequences. Smith v. City of Miner, 761 S.W.2d 259, 260 (Mo. Ct. App. 1988).

Phygen argues that CoreLink should have purchased a new PLIF and put it into service to mitigate its damages.[9] It is not reasonable to expect an injured party to take steps to avoid loss if those steps may cause other serious loss. A party "need not, . . . incur unreasonable expense . . . or disrupt his business." Restatement (Second) of Contracts § 350, comment g (1981). Walter testified that it does not make "economic sense" for CoreLink to purchase fewer than 10 to 15 PLIFs at a time. Id.

---

[9]The purchase of a single PLIF would have cost CoreLink $87,000. Walter Dep. at 77.

at 75-76. Walter also testified that the company did not want to allot the cash to purchase a PLIF because it was investing in other areas of the business. Id. at 77. CoreLink was not required to undergo unreasonable expense or disrupt other business in order to mitigate damages.

### d.     Phygen's "admissions"

Phygen filed an action for professional negligence against its insurance broker, seeking unspecified compensatory damages. Complaint, Phygen, LLC v. Bowermaster & Assocs. Ins. Agy., Inc., Case No. 30-2014-007 17604-CU-PN-CJC (Sup. Ct. Cal. Apr. 21, 2014) [Doc. #27-10]. Phygen's complaint pleads that CoreLink sent it an invoice for, and initiated this legal action to recover, $493,780. Complaint ¶¶10, 12. Phygen also filed an action for conversion and theft against Expo, seeking "actual damages in an amount no less than $493,780." Petition ¶¶ 21, 28, 36, 29, Prayer (ii). First Amended Petition, Phygen, LLC v. Austin Maynard & Expo Acquisitions, LLC, Case No, 2013 -DCV- 1843 (El Paso Cty. Dist. Ct. Nov. 14, 2013) [Doc. #27-11]. CoreLink asserts that Phygen has "admitted" that the amount of CoreLink's damages is $493,780, by pleading that amount as damages in its actions against Bowermaster and Maynard.

"[J]udicial admissions are conclusive upon their maker," and are "binding for the purpose of the case in which the admissions are made including appeals." State Farm Mut. Auto. Ins. Co. v. Worthington, 405 F.2d 683, 686 (8th Cir. 1968)). "[T]his does not make the same judicial admissions conclusive and binding in separate and subsequent cases." Id. While Phygen's statements in these pleadings can be used as evidence in this matter, they are ordinary admissions that may be considered by the factfinder in this matter and are not binding judicial admissions. Pagett v. Allied Mut. Ins. Co., No. 2:05 CV 00042 ERW, 2006 WL 2246428, at *3 (E.D. Mo. Aug. 4, 2006).

-11-

### e. **Speculative damages**

To recover damages, the party claiming damages resulting from a breach of contract must prove "the existence and amount of damages with reasonable certainty." U.S. Neurosurgical, Inc. v. Midwest Div.-RMC, LLC, 303 S.W.3d 660, 667 (Mo. Ct. App. 2010) (citation omitted). Thus, the claimant must submit "a basis for a rational estimate of damages without resorting to speculation." Id. CoreLink seeks $493,780, which it asserts is the "retail value" for the PLIF. Walter Dep. at 19. Walter testified that the retail value is the sum of CoreLink's costs plus lost revenue stream. Phygen argues that CoreLink's damages for each component are speculative.

CoreLink claims that its costs for the missing PLIF total $153,761.16. Pl. Interrog. Resp. No. 2 [Doc. #28-1];Walter Dep. at 40. The replacement cost for a single PLIF is $87,863.52. Walter Dep. at 24. CoreLink also seeks costs for storage, overhead, and regulatory compliance in the amount of $65,897.64. Walter calculated this figure by totaling all such costs for 2012 and 2013 and distributing them on a percentage basis across CoreLink's inventory. Walter Dep. at 37. Phygen argues that this calculation is speculative because CoreLink did not identify storage, regulatory or overhead costs specifically linked to the PLIF. The apportionment method that Walter described is rational and appropriate for distributing costs across inventory items, and CostLink was not required to provide the kind of evidence Phygen seeks.

Phygen also argues that, under Missouri law, the costs and expenses must be deducted from lost revenue damages. Phygen relies on Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc., 155 S.W.3d 50 (Mo. 2005) (*en banc*), in which the court held that, in tort actions, variable expenses should be deducted from estimated lost revenues in the calculation of lost profits damages. Id. at 55. In the case of a breached contract, however, a seller is entitled to recover "fixed costs" or "reasonable

overhead" that it would have paid out of the proceeds of a breached contract. Scullin Steel Co. v. Paccar, Inc., 748 S.W.2d 910, 914 (Mo. Ct. App. 1988). The parties have not addressed whether the costs at issue here are fixed or variable, thereby precluding summary judgment.

CoreLink seeks damages for lost revenues in the amount of $340,018.84. Walter testified the PLIF would have remained in service for another five years after its loss, and would have been used in approximately 50 surgeries per year, using an average of 1.5 parts per surgery, at an average sales price of $2,300 per part, yielding a total of $862,500 attributable to lost revenue. Walter Dep. at 41. CoreLink offers no explanation as to how it decided to reduce that figure to just over $340,000, and the court agrees with Phygen that the lost revenue calculation is speculative. Furthermore, Phygen's CFO, Robert Smart, testified that the PLIF was used in 2012, on average, .6 times per month, and that CoreLink's revenue per implant was $1,546, thereby creating a material factual dispute with respect to the assumptions used in CoreLink's calculations.

To summarize, the court finds that CoreLink is entitled to summary judgement on liability. With respect to damages, the court finds that § 4.19 (limitation of liability) and § 2.1 (sale price) do not apply to CoreLink's damages and that CoreLink was not required to purchase a PLIF to mitigate its damages. However, genuine disputes of material fact with respect to CoreLink's calculation of expenses and revenue preclude summary judgment on the issue of damages.

\* \* \*

In accordance with the foregoing,

**IT IS HEREBY ORDERED** that the motion of plaintiff CoreLink for summary judgment [Doc. #25] is **granted with respect to liability only**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment is **denied in all other respects**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 12th day of December, 2014.